**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
-------------------------------------------------------X
JOHN DOE,                              :
                                       :        Civil Action No.:
                       Plaintiff,      :
                                       :
          v.                           :
                                       :
FRANKLIN AND MARSHALL COLLEGE,         :
                                       :
                       Defendant.      :
-------------------------------------------------------X
```

**COMPLAINT AND JURY DEMAND**

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP and Summers, McDonnell, Hudock, Guthrie & Rauch, P.C , as and for his complaint against Defendant Franklin and Marshall College ("F&M" or the "College"), respectfully alleges as follows:

**THE NATURE OF THE ACTION**

1.      This action arises out of an egregious miscarriage of justice against Plaintiff, a male undergraduate student at F&M, through the College's rushed, flawed, and biased Title IX sexual misconduct process, carried out under the presumption of guilt in an attempt to find Plaintiff responsible to make up for F&M's long history of failing to adequately respond to sexual assault allegations against males.

2.      Complainant Jane Roe[2] (hereinafter "Complainant" or "Roe") falsely accused Plaintiff of sexual assault while Plaintiff was in Florida with F&M's baseball team. Roe took her

---

[1] Plaintiff has filed a motion herewith to proceed by pseudonym.
[2] Jane Roe is a pseudonym.

complaints to the Winterhaven Police Department, and had Plaintiff arrested for something that he did not do, causing Plaintiff severe mental and emotional anguish.

3.     Worse, F&M's baseball team offered Plaintiff no support through the process, and even *left him on his own in Florida*, hundreds of miles away from home after his arrest, when the coach told him he wouldn't leave Florida without him.

4.     Even after Plaintiff finally was acquitted of the criminal allegations against him, however, he was met with a College investigation that essentially denied Plaintiff of his due process rights.

5.     Indeed, from inception, F&M's investigation and adjudication process was flawed, biased, and deficient. Throughout the Title IX disciplinary process, Plaintiff was subjected to unfair and gender-biased treatment. Plaintiff was presumed guilty from the start; Defendant resolved all factual inconsistencies in favor of Roe's claims, despite the patent credibility issues, and the fact that the College, on information and belief, never even directly spoke to Roe; evidence bearing heavily on Roe's credibility was not considered or given proper weight; and, overall, the investigation report was tailored towards a predetermined outcome of finding Plaintiff responsible as a male accused, regardless of the actual facts and evidence of the case.

6.     Additionally, when Plaintiff received astonishing, harassing and threatening communications from one of his female professors, the College ignored Plaintiff's complaints, subjecting him to further harassment and creating a hostile environment at F&M where Plaintiff neither felt safe nor welcome.

7.     As a result of F&M's flawed and biased investigation and adjudication process, Plaintiff was found responsible for sexual assault and sanctioned to a two-year suspension, forever marring his educational file with an improper and damaging finding and sanction.

8.      By employing gender-biased, pre-determined presumptions of Plaintiff's guilt from the outset, and my imposing an unreasonable sanction, Defendant displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

9.      By violating its own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendant breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition at F&M.

10.     Defendant engaged in a biased, flawed, and deficient investigation and disciplinary process, which rendered a finding and sanction that were arbitrary, capricious, unreasonable, fundamentally unfair, and not supported by sufficient evidence.

11.     As a result of Defendant's discriminatory and unlawful conduct, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished/lost future educational and career prospects.

12.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

13.     Plaintiff is a natural person and resident of New York. During the events described herein, Plaintiff was enrolled as a fulltime, tuition-paying, undergraduate student-athlete at F&M.

14.     Defendant F&M is a partially federally funded private university located in Lancaster, Pennsylvania, where it maintains its principal offices and place of business.

## JURISDICTION AND VENUE

15.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; (ii) Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000; and (iii) the state law claims are

so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

16.     This Court has personal jurisdiction over Defendant F&M on the ground that it is conducting business within the State of Pennsylvania.

17.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**I.      BACKGROUND.**

**A.      The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.**

18.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

19.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

20.     The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

21.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

22.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies and advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf OCR's April 2014 at 31.

23.     In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. Id. at 25-31.

24.     In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

25.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct.

26.     Colleges and universities, including F&M, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like F&M, have limited procedural protections afforded to males, like the Plaintiff, in sexual misconduct cases.

27.     Indeed, in 2014, the OCR launched an investigation into F&M's handling of sexual assault allegations, after a student complained to the OCR regarding F&M's failure to adequately address sexual misconduct complaints. *See* Tim Stuhldreher, *Education Dept. officials convene focus groups in Title IX investigation at Franklin & Marshall*, Lancaster Online (Apr. 22, 2015), available at https://lancasteronline.com/news/local/education-dept-officials-convene-focus-groups-in-title-ix-investigation-at-franklin-marshall/article_02e6adb6-e93d-11e4-a49d-070c58af0e0a.html.

**B.     The 2017 Revocation of the DCL**

28.     On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

29.     In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Ed., Dear Colleague Letter (Sept.

22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

30.     The 2017 Q&A suggests that the policies and procedures in place at F&M at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

31.     On information and belief, despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, F&M did not change its Title IX procedures. *See Letter from President Altmann,* available at https://www.fandm.edu/uploads/files/9716595581057612-altman-ltr.pdf.

### C.     The 2020 Title IX Final Rule

32.     On May 6, 2020, the Department of Education released new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020. ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

33.     The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

34.     The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding, including the right to a live hearing with cross-examination of all witnesses. (*See* "Summary of Major Provisions of the

Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

35.     In light of the 2020 Title IX Final Rule, F&M updated its Title IX Policy as of August 2020.

> **D.     F&M Faces Years of Complaints for Failing to Adequately Address Claims of Sexual Misconduct Allegedly Committed by Male Students and/or Faculty**

36.     For years, F&M has faced student pressure regarding its failure to adequately address sexual misconduct complaints made against male students and faculty.

37.     Indeed, in light of the 2014 OCR investigation, F&M undertook a campaign that same year to take a hardline stance against sexual assault, instituting a mandatory, two-hour Orientation discussion centered around sexual assault prevention, and a "yearlong program to prevent sexual misconduct." *See* Chris Karlesky, *Confronting Sexual Assault*, Franklin & Marshall Magazine (Dec. 2, 2014), available at https://www.fandm.edu/magazine/magazine-issues/autumn-2014-issue-79/autumn-2014-articles/2014/12/02/confronting-sexual-assault.

38.     Then-President of the College and "advocate for survivors of sexual assault," Daniel Porterfield, noted that F&M was focused on encouraging a "come forward" culture, and stated that the College must "redouble" its efforts towards prevention education. *Id.*

39.     In recent years, the College has been a fierce advocate for survivors of sexual assault and sexual assault prevention, hosting yearly "take back the night" rallies. *See* Katir E. Machen, *Franklin & Marshall Community 'Took Back the Night' from Violence,* Franklin and Marshall News (Apr. 12, 2018), available at https://www.fandm.edu/news/latest-news/2018/04/12/franklin-marshall-community-took-back-the-night-from-violence.

40.     Students have also been particularly vocal on campus, starting a petition calling on F&M to ban the Phi Kappa Tau fraternity from campus following allegations of sexual assault,

which garnered hundreds of student signatures. *See* Maria Coakley, *Permanently remove Phi Kappa Tau from Franklin and Marshall's campus,* Change.org, available at https://www.change.org/p/franklin-and-marshall-college-permanently-remove-phi-kappa-tau-from-franklin-and-marshall-s-campus.

41.     On this petition, one student highlighted F&M's historical failure to adequately address allegations of sexual assault, stating, "F&M continuously fails to provide confidence in its handlings of sexual assault cases. Since it won't protect students after the fact, we need stronger ways to prevent rape culture on campus. If they don't want the frat closed, give us a reason to think you're doing all you can to help survivors."

42.     In the midst of public pressure, when the allegations against Plaintiff became public, multiple news sources published the story.

43.     On information and belief, F&M then felt pressure to "overcorrect" and use Plaintiff as an example of its dedication to taking allegations of sexual assault seriously.

44.     On information and belief, F&M's leadership exerted pressure, ideological and otherwise, to find against males accused of sexual misconduct and to deprive them of due process.

45.     On information and belief, F&M was responding to pressure from the College's leadership and from local and student media when they rushed to find Plaintiff responsible against the overwhelming weight of the evidence.

46.     On information and belief, it was in part because of the fear of another OCR investigation, and because of the bad publicity surrounding the College, that the College rushed to find Plaintiff responsible.

47.     Plainly, the College simply did not want another situation in which it could be perceived as ignoring the complaints of women on campus.

48.    On information and belief, F&M has repeatedly conducted gender-biased investigations, applied unfair procedures, and imposed disproportionate sanctions against male students accused of misconduct.

### E. Plaintiff

49.    Plaintiff John Doe matriculated to F&M in 2019, with an expected graduation date of May 2023.

50.    Throughout his time at F&M, Plaintiff was a member of F&M's baseball team, often traveling to various games throughout the country.

51.    Until the events described herein, Plaintiff maintained a spotless record, and was never subject to discipline for misconduct of any kind.

52.    Indeed, Plaintiff was such a stellar student that he even received a Congressional Nomination to the United States Naval Academy and made Deans List consistently.

### F. The Alleged Incident

53.    In March of 2022, Plaintiff traveled with F&M's baseball team to Florida to play in a series of games. This trip was an annual trip for the F&M baseball team, and Plaintiff had attended other out of state and overnight trips previously with no issues.

54.    As a member of F&M's baseball team and with a Congressional Nomination to the United States Naval Academy, Plaintiff was cautious, respectful, and would not do anything that could jeopardize his bright future.

55.    On March 14, 2022, Plaintiff and a number of his teammates went out to lunch after one of their games.

56.    While at the restaurant, Plaintiff encountered a female, Jane Roe, who lived locally.

57.     Plaintiff and Jane Roe engaged in casual conversation, until Jane Roe gave Plaintiff her number so that they could continue talking and meet up later that night.

58.     Later that night Jane Roe picked up Plaintiff at his hotel. Later that evening Jane Roe engaged in consensual kissing.

59.     Plaintiff and Jane Roe then engaged in a brief, consensual sexual encounter, in which Jane Roe was an active, consenting, willing participant.

60.     At no time did Jane Roe withdraw her consent or express her non-consent.

61.     On information and belief, however, Jane Roe had a boyfriend in Florida, and did not want him to find out about her consensual sexual encounter with Plaintiff.

62.     Accordingly, the next day, Jane Roe went to the police claiming that she had been sexually assaulted by Plaintiff.

63.     On March 18, 2022, Plaintiff was arrested purely based off of Jane Roe's unsubstantiated allegations.

64.     Plaintiff was shocked, terrified, and traumatized, as he did not sexually assault Jane Roe. As stated above, Plaintiff had worked hard his entire time at F&M to be an upstanding student, and he would never put himself in a position to jeopardize his education or harm another individual.

65.     To make matters worse, once Plaintiff was arrested, the F&M baseball team *left Plaintiff in jail in Florida*, and flew home to Pennsylvania. Plaintiff was abandoned by F&M in a foreign state, without family, and without even the support of the coaches that Plaintiff had worked so hard to compete for while attending F&M.

66.    Plaintiff then posted bail on March 20, 2022, and, traumatized dealing with life-altering false criminal allegations against him, flew home to New York that same day to be with his family.

67.    Little did Plaintiff know, however, that the criminal investigation against him was only the beginning, and that F&M would have Plaintiff presumed guilty from the outset.

68.    Upon returning home, Plaintiff experienced absolutely no support from F&M.

69.    On March 22, 2022, Plaintiff reached out to his baseball coach, Coach Horning, to inquire about returning to campus.

70.    Shortly after, however, Plaintiff received an email from Lauren Packer Webster ("Webster"), Director of Athletics, suspending Plaintiff from the baseball team effective immediately.

71.    In support of the team suspension, Webster cited the criminal allegations against Plaintiff, claiming that the Athletic Code of Conduct required immediate suspension for any "felony offense." However, at the time of the letter, *Plaintiff had not been convicted (and never was)*. Therefore, Webster presumed Plaintiff guilty, based off of allegations alone.

72.    Webster's letter also cited Plaintiff's alleged violation of the baseball team's rules, claiming that on the night of the alleged incident, Plaintiff left the team without approval and broke curfew. However, Webster's letter failed to cite that *numerous* members of the F&M baseball team were out on that same night, and none were punished for the alleged breach of the team rules.

73.    Indeed, Plaintiff's teammates had been going across the state to casinos, traveling to friends' houses, and staying overnight outside of the team's hotel because there were no team rules on this trip. The Coach even paid for some of the athletes' alcohol while at the restaurant.

12

74.     Thus, Plaintiff was singled out and arbitrarily punished from the outset, with no evidence to support the decision.

75.     As a result of the immediate suspension, Plaintiff was unable to practice, workout, or compete with the team, thereby severely affecting his athletic abilities and his prospects for playing the sport professional post-graduation.

76.     Webster's letter also mentioned that the matter had been referred to Dean Collette Shaw ("Dean Shaw"), for the College's "judicial process." That judicial process, however, was far from judicial, and rather, sought merely to confirm the Complainant's fabricated stories.

77.     Dean Shaw called Plaintiff shortly after to see what his academic plans were, and she advised Plaintiff that he should, "truly think about returning to campus" because "the school [Plaintiff] would be returning to would not be the same one [he] knew." Dean Shaw also stated that if the news stories about the allegations against Plaintiff were not on the protest tree[3] yet, it was most likely only a matter of time due to how active the student body can be at F&M. Dean Shaw also refused to facilitate online schooling for Plaintiff in light of the situation, and stated that it would be up to the professors' individual and sole discretion to facilitate Plaintiff finishing the school year remotely.

78.     Plaintiff's criminal attorney then contacted Dean Shaw to inform F&M that given the concurrent criminal investigation, Plaintiff would be unable to participate in the college investigation and that requiring him to answer questions or make statements about the underlying events would impair his Fifth Amendment rights, as invoking his right to remain silent would undoubtedly result in a finding of responsibility in the college proceedings.

---

[3] The protest tree is a tree on campus where students publicly post their grievances.

79.     Accordingly, Plaintiff's attorney requested that the college stay the proceedings pending the outcome of the criminal investigation, when Plaintiff would be able to properly defend himself, especially given the significant impact of a responsible finding at the college level.

80.     Despite this request, the College proceeded forward with the investigation, knowing that Plaintiff would be unable to defend himself.

81.     On information and belief, F&M had already decided, regardless of Plaintiff's participation, that the University would proceed forward and find Plaintiff, as the male accused, responsible for the allegations.

82.     Although the College chose to proceed with the investigation in Plaintiff's absence, Plaintiff did not receive formal notice of the charges until April 22, 2022, *over one month after the College became aware of the allegations*.

83.     Accordingly, the College began to build a case against Plaintiff before Plaintiff was even notified of the specific policy provisions that he was alleged to have violated, effectively precluding Plaintiff from any meaningful ability to defend himself.

84.     The April 22 letter notified Plaintiff that the investigation *had already been concluded*, and stated that Plaintiff was being charged with three violations of the Community Standards Sexual Misconduct Policy ("CSSMP"): (i) Sexual Contact Without Consent; (ii) Sexual Penetration Without Consent; and (iii) Sexual Assault. Plaintiff was also charged with one violation of the Student Code of Conduct ("SCC"): Violation of federal, state, or local statutes, codes, or regulations.

85.     The April 22 letter, Plaintiff's initial charging letter, also informed Plaintiff that there would be a hearing on the matter on May 3, *in less than two weeks,* in the middle of finals week, and within hours of one of Plaintiff's finals.

14

86.     Regardless of Plaintiff's ability to participate, Plaintiff had no opportunity to meaningfully present a defense, given that he did not receive formal charges until after the investigation had closed, and less than two weeks before the hearing.

87.     Worse, despite the conclusion of the investigation, *Plaintiff never received an investigation report even after Plaintiff's attorney requested it several times in writing.* It was therefore impossible for Plaintiff to even know what evidence was to be used against him, again demonstrating F&M's efforts to deliberately and intentionally impair Plaintiff's ability to defend himself.

88.     In response, Plaintiff's attorney emailed Dean Shaw on April 24, again requesting that the College stay the hearing given the concurrent criminal investigation, and in light of the fact that after the conclusion of the criminal investigation, Plaintiff would be able to present exculpatory evidence in his defense.

89.     Additionally, Plaintiff's attorney noted that the SCC charge was improper, as it alleged that Plaintiff engaged in sex with a minor. However, under applicable Florida law, Jane Roe was legally able to consent at the time of the alleged encounter.

90.     Despite this email, the College refused to drop any charges, and further refused to stay the hearing.

91.     The hearing was conducted in Plaintiff's absence on May 3, 2022. However, Plaintiff was never provided a transcript or recording of the hearing, and thus, Plaintiff has no way of knowing what occurred at the hearing, which severely impaired his ability to appeal.

92.     Plaintiff received an email with a Decision Letter just *three days after the hearing*.

93.     The Decision Letter found Plaintiff responsible for all four allegations against him, relying *solely* on the one-sided Winterhaven police report, a document which was not created by the College. Plaintiff was sanctioned to a suspension until the Fall of 2024.

94.     On information and belief, the College *never even interviewed Jane Roe*, and did not assess her serious credibility concerns or her motives to lie.

95.     For example, the Decision Letter failed to address that the story Jane Roe told varied widely between what she told her witnesses versus what she initially told the police, which is information that F&M would have known had the disciplinary proceedings been stayed until the conclusion of the criminal investigation as requested.

96.     Instead, the Decision Letter focused only on the police report, a one-sided document created for the express purpose of prosecuting a defendant and skews the facts in the light least favorable to the defendant.

97.     Indeed, the police report quoted only a few words out of a fourteen-minute control call between Plaintiff and the police department.

98.     Notably, there was also a one-hour long conversation that Plaintiff had with detectives from the police department, and not one word from that interview made it into the police report because, on information and belief, Plaintiff was adamant that the allegations against him *were not true*. After the interview, Plaintiff even discussed the scenario with his head coach for two hours where he was also adamant that the allegations against him were not true.

99.     Despite not having created this document on their own, F&M made *no effort* to corroborate any of the allegations in the police report, and rather, took the allegations at face value without examining any credibility concerns. For example, the detective in charge of the case has criminal charges for spousal abuse on his record, and this was never noted by the College.

100.    On information and belief, F&M took the allegations at face value because it fit the College's preconceived notion of Jane Roe as the "victim" as the female accuser, and Plaintiff as the "perpetrator" as the male accused.

101.    The College's preconceived notion of Plaintiff's guilt is further supported by the short *three days* that it took the College to consider the "evidence" and find Plaintiff responsible. On information and belief, no genuine inquiry into the actual evidence was performed, as demonstrated by the scant three lines of reasoning presented in the Decision Letter finding Plaintiff responsible.

102.    On May 10, four days after the Decision Letter, Plaintiff received a "no bill" from the Florida State Attorney's Office, meaning that the case was dropped due to a lack of sufficient evidence – evidence which F&M *could have had*, and *knew* it could have had, if it stayed the proceedings until the end of the criminal investigation.

103.    Instead, the College chose to rush its adjudication and make its decision based almost exclusively on the reliance of an untested police report, knowing that the male respondent could not defend himself, due to, on information and belief, the pressure upon the College to punish male perpetrators.

104.    Following the no bill, Plaintiff's attorney emailed Dean Shaw the new evidence, explaining the utter lack of evidence to have found Plaintiff responsible.

105.    Plaintiff timely appealed the finding and sanction on May 13, 2022, citing as new evidence the no bill from the Florida State Attorney's Office.

106.    Astonishingly, despite this clear evidence that the allegations against Plaintiff were fabricated, F&M refused to consider the no bill in any form because, on information and belief, it did not fit F&M's preconceived notion of Plaintiff's guilt. The fact that Plaintiff was *completely*

*exonerated* from the allegations *and* the police report on which F&M solely relied in coming to its conclusion of Plaintiff's responsibility seemed to have no bearing on F&M, because F&M had already determined that Plaintiff was guilty from the outset of the investigation.

107.    On May 24, Plaintiff's attorney emailed Margaret Hazlett ("Hazlett"), Vice President and Dean of Student Affairs, for an update on the appeal, given that transfer applications to other universities were due on June 1.

108.    The next day, Hazlett emailed Plaintiff denying his appeal in its entirety, rubberstamping the initial decision, and claiming that Plaintiff had not presented any new evidence, despite the fact that the no bill did not exist until after the initial decision was rendered.

109.    On May 27, Plaintiff's attorney emailed Dean Shaw one final time expressing his disappointment in F&M's egregious handling of the matter, given that the police department determined there was no evidence to prosecute Plaintiff, yet the College steamrolled forward to have Plaintiff found responsible, and denied him a proper opportunity to defend himself, even after the criminal investigation concluded. The College never responded.

110.    As a result of F&M's mishandling of the investigation and its improper finding, Plaintiff's transfer application to Fordham University had to go through a disciplinary dean and was denied, demonstrating that Plaintiff's records will forever be marred with a finding of responsibility for sexual assault.

111.    Plaintiff has exhausted all available avenues for appeal under F&M's policies. This lawsuit represents Plaintiff's only hope to redress the wrongs occasioned by Defendant.

### G.  F&M Subjects Plaintiff to Harassment by a Professor

112.    While the College's investigation was pending, not only did the College deliberately and flagrantly disregard Plaintiff's due process rights, but it also failed to protect Plaintiff from harassment that he was experiencing at the hands of a female professor.

113.    Beginning in March 2022, when Plaintiff returned from Florida, he received a series of inappropriate emails from Professor Eunbi Kim ("Professor Kim"), his instructor in his course entitled "Issues Facing Organizations in the 21st Century."

114.    Plaintiff had a meeting scheduled with Professor Kim on March 21, 2022. However, Plaintiff was unable to attend the meeting given his current situation.

115.    Plaintiff left his phone and laptop in Florida, so he was unable to access his school email. Accordingly, Plaintiff emailed Professor Kim from his personal email on March 21, 2022, to let her know that he could not meet with her as scheduled.

116.    Professor Kim then sent numerous inappropriate emails from her own personal email to Plaintiff.

117.    However, when Plaintiff did not respond to Professor Kim's emails, she harassed Plaintiff, insulted him, retaliated against him by impacting his course grade, and even threatened self-harm if he did not respond.

118.    On March 21, 2022, at approximately 10:00pm, Professor Kim responded to Plaintiff stating that it was okay to reschedule the meeting and wishing Plaintiff safe travels.

119.    When Plaintiff did not respond, Professor Kim emailed Plaintiff again *one hour later* from her personal email stating:

> I know you are angry with me, [Plaintiff]. *You are such an idiot*. I was going to explain things to you today but I guess we will need a much longer conversation than I thought. Since you stood me up, ***bring me something 'hot and sweet'*** when you visit me for a meeting. Don't forget to get one for yourself too. If you'd like

me to get fired, you can report this personal message to the school. (emphasis added).

120.     Plaintiff did not respond to this email.

121.     On March 23, 2022, Plaintiff and Professor Kim exchanged emails from their school emails. Plaintiff requested to fulfill the class requirements by attending lectures remotely and recording his final assignment via Zoom. Professor Kim approved Plaintiff's request.

122.     On March 24, 2022, at approximately 5:45 a.m., Professor Kim emailed Plaintiff from her school email with a Zoom link for their March 28, 2022 meeting.

123.     That same day at 10:38 a.m., Professor Kim emailed Plaintiff from her *personal* email address again, stating:

> Last year, there was a faculty member who acted very inappropriately toward me and tried to get me fired when rejected. I had to submit a whole bunch of paperwork to prove that I didn't do anything wrong but he was just retaliating. ***At least students are harmless.*** It was a tough year and that's why I stayed close to my friends in New York in the fall. ***Can you be patient with me please? I'd love to make friends with you and would really appreciate it if you could wait until the end of the semester when you are no longer in my class. Let's stay professional until then, please.*** (emphasis added).

124.     Plaintiff again did not respond to this email.

125.     At 3:39 p.m. the same day, Professor Kim emailed Plaintiff from her school email, stating that she wanted to reschedule their March 28 meeting until the following week.

126.     On March 27 and March 28, Plaintiff and Professor Kim again exchanged emails from their school emails related to classwork. Professor Kim thanked Plaintiff for sending his notes, and sent Plaintiff the guidelines for his final assignment.

127.     On March 28, Professor Kim also emailed Plaintiff from her school email, asking if Plaintiff could continue working as her research assistant, and stated that she would understand if he could not, given his personal matters. Plaintiff did not respond.

128.    On March 29, on information and belief, angered that Plaintiff was not responding, Professor Kim emailed Plaintiff from her school email, stating that a group of students informed her that they were unhappy with Plaintiff working as her research assistant. However, this statement was untrue. Professor Kim also stated that Plaintiff did not need to send in his spreadsheet and that he did not need to continue his work as research assistant. Plaintiff did not respond.

129.    On March 31, Professor Kim emailed Plaintiff from her school account stating:

> *I gave some thoughts and came to the conclusion that I do not wish to grade your summaries and your final pitch*. I apologize *that I changed my mind* but BOS480 is a seminar course and class discussion (both listening and speaking) is actually very important. I hope you understand my decision. *The two options I have for you is either to withdraw the class and retake it in the future or to get the grade based on your past performance.* (emphasis added).

130.    On information and belief, Professor Kim's email was retaliation against Plaintiff because Plaintiff was not responding to her emails.

131.    Plaintiff responded, requesting that Professor Kim reconsider her decision for him to complete the final assignment remotely, but Professor Kim refused.

132.    On April 1, 2022, Professor Kim emailed Plaintiff from her personal email, stating:

> I hope you are doing well [Plaintiff], *I'm writing to ask you to leave the class. I do not wish to engage in any kind of interactions with you any further.* I have been understanding and patient with you probably much more than I should have.
>
> I'm very disappointed that you treated me with disrespect many times by *ignoring my emails*, not showing up for the meeting intentionally and lying that you didn't have access to F&M accounts (faculty can check students' online activities), bench-clearing against me with your baseball teammates, trying to give me pressures in class by allying with other students, and most importantly, you acted very untrustworthy.
>
> I specifically asked you not to tell other students that I offered you the RA opportunity. Yet, you still told the students and also bad-mouthed me. I didn't have to work with me [sic]. *I offered you the job because I wanted to work with you. I asked you to keep it a secret because other students already felt that I was giving*

*too much attention and I didn't want to create any more unfairness/favoritism during class at least. That's what I wanted to explain during a meeting and that's why I sent you a personal email to ask you to wait until the end of the semester to make friends. Of course, there is a code of conduct too.*

To be honest, the ways in which you acted are very similar to how the guy who tried to get me fired behaved last year, by bad-mouthing me to other faculty, allying with them to give me pressures, treating me with disrespect and publicly humiliating me during meetings. I was just lucky that the school is reasonable enough to recognize my performance and understand his inappropriateness.

I'm really done with you, [Plaintiff]. I have given you more than I should have. I do not want any interactions with you anymore. ***I'd really appreciate it if you just withdrew the class*** but if you still want to stay, I cannot stop you.

It's really a shame. ***I really liked you as a person and wanted to make friends with you after the class is done.*** I meant everything I said in my office but I'm really exhausted now. (emphasis added).

133.    On April 3, Professor Kim emailed Plaintiff from her school email, stating: "I am willing to grade your pitch **IF** you have reflected on your misbehavior in class and agree to act professionally and respectively. Please think about it and let me know." (emphasis in original). Plaintiff did not respond.

134.    On April 4, at 6:05 a.m., Professor Kim emailed Plaintiff from her personal email, stating: "You can decide whether you'd like to submit the rest of the course requirements. ***I will just give you an A, that seems to matter to you. I am done with myself hating and being angry at you too***." (emphasis added). Plaintiff did not respond.

135.    That same day, at 1:58 p.m., Professor Kim emailed another F&M employee, copying Plaintiff, requesting that Plaintiff be removed from the student-worker list. Professor Kim then emailed Plaintiff stating that another student would be working on his spreadsheet, and asked Plaintiff to send her the spreadsheet he had been working on.

136.    The same day, at 5:11 p.m., Professor Kim emailed Plaintiff from her personal email, stating:

*I'm very sorry I said all those awful things to you*, didn't believe you have a personal matter, and may have made you feel very uncomfortable. *I'm really sorry that I acted in a horrible way that may have hurt you further*. I don't know what else to say. I'm just very concerned about you. I hope you are okay and everything goes well. Please take good care of yourself and let me know if you need anything. I'm really sorry about all that I did or said to you. (emphasis added).

137.    Plaintiff did not respond to this email.

138.    Professor Kim then emailed Plaintiff the *same day* at 11:45 p.m. from her personal

email, stating:

I really don't know what to say or where to start but I needed to email you again. I'm sorry I have to bother you again.

I'm very sorry that I got you all wrong. I was just so preoccupied with my own problem and wasn't even thinking that I was hurting you so much. I'm so sorry. I realized that you tried to come back to campus for a meeting with me after your parents bailed you out. *I'm sorry I didn't know that you were making much effort to see me* when you have a lot going on. I'm sincerely regretful that I jumped the gun on judging you that you were trying to give me a hard time when it was actually the opposite.

I know it's my personal issue that I have become very sensitive and paranoid, working at F&M over the years. *I better understand now you went above and beyond several times to show me that you care about our relationship, making time and efforts for me.* I feel awful that I didn't realize that for so long. I'm just really dumb and stupid.

*I was just a bit afraid that I felt too close to you sometimes even when you are not around. I was worried that I might say or act in an appropriate way and make things awkward for you like the guy did to me. You are not only much younger than me but also my student. I didn't want to use my power/authority to put you in a situation that you might feel uncomfortable with. That's why I wanted to see you in the classroom rather than in the office.* It wasn't about you but rather about me. I wanted to push you away until I can act much friendlier. I'm sorry that my attitude and behavior may have hurt you and that I blamed you instead.

I'm really worried about you. I hope it wasn't anything serious that could cause you any future problem. Please write to me when you feel ready to start talking to me again. I hope to know you are okay. *If I don't hear from you ever, I'll just shoot myself.* I'm truly sorry about my immaturity and inconsiderateness. I'm a total jerk. (emphasis added).

139.   Plaintiff did not respond to this email.

140.   On April 4, 2022, Plaintiff's father spoke with Dean Shaw regarding his serious concerns about the emails.

141.   The same day, Plaintiff's mother had several phone calls with Dr. Amelia Rauser ("Dr. Rauser"), the Senior Associate Dean of the Faculty and Professor of Art History, regarding the harassing emails.

142.   Dr. Rauser then requested that Plaintiff send her the emails from Professor Kim, which Plaintiff promptly sent.

143.   Dr. Rauser's proposed solution to the issue was to block Professor Kim's email.

144.   Dr. Rauser also said in an email dated April 5, 2022, that she would get another one of Plaintiff's current professors to help him finish Professor Kim's class and that she would, "alert Professor Kim to the new arrangement in due time".

145.   On April 6, 2022, Dr. Katharine Snider ("Dr. Snider"), F&M's Title IX Coordinator, sent Plaintiff an email requesting to meet and discuss the emails. Plaintiff responded, stating that he would rather communicate via email.

146.   On April 7, 2022, Dr. Snider sent Plaintiff an email with multiple questions regarding the emails, which Plaintiff responded to, answering each question.

147.   Neither Dr. Snider nor any administrator at F&M offered Plaintiff supportive measures or explained the process of filing a formal complaint.

148.   Instead, *no action was taken at all* against Professor Kim regarding Plaintiff's complaint.

149.   Indeed, on information and belief, Professor Kim remains in her position, without discipline, to date. Professor Kim also remains published on the F&M website.

150.    As a result of F&M's utter failure to take any corrective action or protect Plaintiff, Plaintiff was subjected to further harassment *after* F&M had been put on notice of the emails.

151.    Indeed, on April 12, Professor Kim emailed Plaintiff from her personal email, with the subject line ***"hi there, dummy"***:

> Your friend told me you said to them that you did it but I don't believe you or him. You probably just wanted to bluff because of your performance at the game that day. Getting plunked is not your fault, you cannot blame yourself and do something stupid, [Plaintiff].
>
> Stay calm and strong when people turn their back on you. Sometimes, time will help. Otherwise, you should be glad to sort people out. There will always be a few who truly care about you and stick around, like your parents?
>
> ***And you promised me that you would take me to the construction site.*** I cannot hang out with you if the record says you are a rapist. -_-
>
> Defense is much more difficult than offense in most cases but you still need to 'proactively' defend yourself. Hope you have hired a good lawyer who can do that on your behalf.
>
> ***I really need to see the construction site.*** I've never been to those places and haven't seen people building things. Keep the promise in the summer, okay? In the meantime, you should keep up with school. You cannot lose your reputation among faculty. ***You need to come back to campus in the fall.*** Be an excellent student, as you've always been. (emphasis added).

152.    Plaintiff did not respond to this email.

153.    F&M, to date, has taken no steps to protect Plaintiff, and Plaintiff has suffered harassment which is so severe and pervasive that Plaintiff has been denied the full opportunity of his education. Indeed, Plaintiff is fearful to even return to campus with Professor Kim present, due to her threatening and harassing emails.

154.    While the College took every measure to take swift action against Plaintiff as a male accused by a non-student female, without any supporting evidence, F&M refused to take

action against Professor Kim, as a female accused, despite numerous emails that blatantly demonstrate her harassment of Plaintiff, a male student at F&M.

## II. AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT F&M

155.    Upon Plaintiff's matriculation to F&M, Plaintiff and F&M became mutually bound by the CSSMP, the SCC, and F&M's Title IX Policy (the "Title IX Policy") (hereinafter collectively referred to as the "Policies").

156.    On information and belief, the Policies are updated and/or reviewed each new school year.

157.    The Policies constitute and represent a contract between students and the College, and in particular, between Plaintiff and F&M.

158.    Throughout the Title IX process in this case, Defendant breached its contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policies and permitting gender bias to infect and taint the proceedings.

159.    The CSSMP states that it applies to behavior that has adverse effects for individuals "participating or attempting to participate in Franklin & Marshall's education program or activity, or otherwise has a reasonable connection to F&M."

160.    The College breached the CSSMP because the individual that accused Plaintiff had no connection to F&M, and thus, Plaintiff's actions had no impact on her ability to participate in F&M's programs. Thus, the College did not have proper jurisdiction under the CSSMP.

161.    The CSSMP states that students have "[t]he right to an objective evaluation of all relevant evidence.  The parties will be provided with an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a complaint."

162. The College breached the CSSMP because Plaintiff was not provided with an opportunity to review the evidence. Indeed, Plaintiff was never provided an investigation report before being found responsible.

163. The SCC states that prohibited acts include "violation of federal, state, or local statutes, codes, or regulations."

164. The College violated the SCC because Plaintiff should not have been charged or found responsible under this provision, because Florida law did not prohibit Plaintiff from having a consensual encounter with the Florida resident, who was of consenting age at the time of the alleged incident.

165. The SCC promises students a "balanced and fair resolution process" in investigating and adjudicating allegations of sexual misconduct.

166. The College breached the SCC because, as demonstrated above, the process Plaintiff was afforded was far from fair and impartial. Instead, Plaintiff was denied a meaningful ability to be heard, including the ability to appear at a live hearing given the College's refusal to stay the proceeding, and was presumed guilty from the outset.

167. The Title IX Policy states that "prohibited conduct" includes "Title IX Harassment," which is defined as:

> conduct on the basis of sex that involves an employee of [F&M] conditioning the provision of an aid, benefit, or service of [F&M] on an individual's participating in unwelcome sexual conduct; or an individual engaging in unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to [F&M's] education program or activity.

168. The College breached this provision because Professor Kim's emails and harassment of Plaintiff squarely fit into the definition of Title IX harassment, yet the College failed to take any action against Professor Kim after being put on notice.

169.     The Title IX Policy states: "[a]ny person may report conduct constituting possible Prohibited Conduct to the Title IX Coordinator," who "will promptly contact the Complainant to discuss the availability of Supportive Measures . . . and to explain the process for filing a Formal Complaint."

170.     The University breached the Title IX Policy because despite being aware of Plaintiff's complaints of Professor Kim's harassment, the College never offered Plaintiff supportive measures, and never informed Plaintiff of the process for filing a Formal Complaint.

## III.     PLAINTIFF'S DAMAGES

171.     As a direct and proximate result of Defendant's biased, unlawful, negligent and improper conduct, Plaintiff was wrongly found responsible for engaging in sexual assault, and such a finding has been made part of Plaintiff's educational records.

172.     These notations of responsibility forever mar Plaintiff's records, especially in the wake of the powerful #MeToo movement, characterizing him as a sexual predator.

173.     Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future.

174.     Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

175.     Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault.

176.     Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, which, on information and belief, will be forever noted on Plaintiff's transcript.

177.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damage to his future educational and career prospects.

178.    Due to Defendant's biased, unlawful, negligent and improper conduct, Plaintiff has been subjected to further harassment and a hostile environment, which is so severe and pervasive so as to deny Plaintiff educational opportunities.

### AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
(Erroneous Outcome)**

179.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

180.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

181.    Upon information and belief, F&M, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

182.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant F&M.

183.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979).

184.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.

185.    Several categories have been observed to challenge university disciplinary proceedings for sex discrimination, including "erroneous outcome" cases, in which the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings.

186.    F&M violated Title IX in the instant case because the University reached an erroneous finding that Plaintiff was responsible for sexual misconduct, and gender bias was a motivating factor in the wrongful finding.

187.    Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above; they include, but are not limited to, the following:

      a.    From the start, the investigation was slanted in favor of the Complainant. The Complainant's story was deemed credible from the beginning and given more weight in the final analysis and determination in what occurred that night. In that regard, Defendant took the Complainant's statements, as incorporated in the police report, at face value, and put the burden on Plaintiff to disprove the allegations;

      b.    F&M relied heavily on a one-sided police report which failed to include exculpatory statements made by Plaintiff;

      c.    F&M failed to stay the proceedings until the conclusion of the criminal investigation, and drew adverse conclusions against Plaintiff based upon his inability to present a defense at the hearing;

      d.    The Decision Letter was not supported by a preponderance of the evidence;

      e.    F&M failed to provide Plaintiff with a copy of the investigation report, and thus failed to allow Plaintiff to review all available evidence before rendering a finding;

      f.    F&M failed to adequately and genuinely consider Plaintiff's appeal, and wrongfully refused to consider the no bill as new evidence.

188.    There was a particularized causal connection between the erroneous outcome in his case and gender bias. Facts sufficient to plead the existence of this bias and its connection to the erroneous outcome have already been alleged in the Complaint in detail and include, without limitation, the following:

      a.    The federal pressure placed on F&M by virtue of OCR investigations, which put F&M at risk for losing federal funding;

      b.    Years of pressure and criticism from the student body specifically geared towards F&M's perceived failure to protect females from sexual misconduct;

      c.    Upon information and belief, F&M's administration and leadership exercised pressure, ideological and otherwise, to find males responsible for accusations of sexual misconduct, even where the evidence suggested otherwise;

      d.    Even though both Plaintiff and Professor Kim had allegations against them which could, if true, constitute violations of Policies, the College only investigated the allegations against Plaintiff, while ignoring the allegations against Professor Kim.

189.    Upon information and belief, F&M's mishandling of Plaintiff's case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

190.    F&M applied its policies and procedures in a manner that discriminated against John Doe on the basis of his sex and led to an erroneous outcome.

191.    F&M also imposed an unwarranted and unjustly severe sanction on John Doe, and gender bias was a motivating factor, for the same reasons as described above.

192.    As discussed above, the public pressure on F&M to vindicate female survivors alleging sexual misconduct caused the University to subject Plaintiff John Doe to a biased and unfair process, which was tilted in favor of the female and against him, the male.

193.    Upon information and belief, F&M has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed upon male students, while not

making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

194.    Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

195.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

196.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing F&M to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

### AS AND FOR A SECOND CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**(Selective Enforcement)**

197.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

198.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et. seq., provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

199.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant F&M.

200.    In "selective enforcement" cases, a Plaintiff can challenge a university disciplinary outcome by asserting that regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

201.    For a selective enforcement claim, a male plaintiff "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University…" and that the "University's actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." *Xiaolu Peter Yu v. Vassar Coll.,* 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015).

202.    In the instant matter, the University subjected John Doe to disparate treatment in comparison to Professor Kim—a similarly situated female—and imposed a more severe sanction upon him.

203.    Doe and Professor Kim were similarly situated because they were both accused of misconduct which, if true, could constitute violations of F&M's Policies.

204.    At the end of the investigation and hearing, F&M found Doe responsible for the allegations set forth by Roe against him and suspended him. Conversely, F&M did not even investigate Professor Kim for any violations whatsoever and did not impose any sanctions upon her.

205.    Based on the foregoing, John Doe was subjected to a biased, prejudiced, and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and punish him severely for it.

206.    This unlawful discrimination in violation of Title IX proximately caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

207.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing F&M to: (i) reverse the outcome, findings, and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding and/or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante.

### AS AND FOR A THIRD CAUSE OF ACTION
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**(Deliberate Indifference)**

208.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

209.    To successfully claim that a university defendant violated Title IX through a policy of deliberate indifference, "there must be both actual notice of the sexual harassment or abuse itself, and the school district must then also display deliberate indifference to that sexual

harassment." *B.W. v. Career Tech. Ctr. of Lackawanna Cnty.*, 422 F. Supp. 3d 859, 877 (M.D. Pa. 2019), on reconsideration in part, No. CV 3:19-1146, 2019 WL 6875493 (M.D. Pa. Dec. 17, 2019).

210.    Defendant F&M was aware of the sexual harassment which Plaintiff was subjected to by Professor Kim.

211.    Defendant F&M was put on actual notice of Professor Kim's sexual harassment of Plaintiff on April 4, 2022, when Plaintiff and Plaintiff's parents spoke to Dean Shaw and Dr. Snider.

212.    Despite F&M being on notice, F&M never formally investigated the matter, and, worse, never took any corrective action against Professor Kim.

213.    As a result of the College's utter failure to take action, Plaintiff was subjected to further harassing emails at the hands of Professor Kim.

214.    Professor Kim's emails have become so severe and pervasive so as to deny Plaintiff of educational opportunities, as Plaintiff is fearful to return to campus with Professor Kim present.

215.    Accordingly, Defendant F&M's practices were a proximate cause of Plaintiff's subjection to months of sexual harassment in the form of ongoing and prolonged harassment by Professor Kim's emails, which Defendant F&M refused to investigate or remedy.

216.    As a direct and proximate result of Defendant F&M's policies and condonation of a sexually hostile environment, Plaintiff was deprived of his access to educational opportunities as he was, inter alia, unable to adequately focus on his studies in light of the sexual harassment. As a result, Plaintiff's grades were negatively impacted.

217.    As a direct and proximate result of Defendant F&M's policies and condonation of a sexually hostile environment, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

218.    In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Breach of Contract**

219.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

220.    At all times relevant hereto, a contractual relationship existed between F&M and Plaintiff by virtue of Plaintiff's enrollment at F&M and as defined by and through F&M's Policies and procedures governing the student disciplinary system.

221.    Through the documents it publishes and provides to students, F&M makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations Policies.

222.    Pennsylvania law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of the Student Handbook become part of that contract. *See Brezinski v. Widener Univ.,* 582 F. Supp. 3d 257, 265 (E.D. Pa. 2022).

223.    Implied in every contract is the covenant of good faith and fair dealing.

224.    Based on the aforementioned facts and circumstances, F&M created express and implied contracts when it offered, and Plaintiff accepted, admission to F&M, and when Plaintiff paid the required tuition and fees.

225.    As detailed above, F&M breached its agreement(s) with Plaintiff throughout the course of its investigation and adjudication of Jane Roe's complaint.  By way of example, and not limitation:

    a.   Failing to provide Plaintiff with a fair and impartial investigation;

    b.   Failing to provide Plaintiff with a meaningful opportunity to be heard;

    c.   Failing to provide Plaintiff with all available evidence;

    d.   Charging Plaintiff with violations which F&M did not have jurisdiction over;

    e.   Failing to adequately pursue Plaintiff's claims of sexual harassment against Professor Kim; and

    f.   Failing to provide Plaintiff with supportive measures or information regarding filing a formal complaint against Professor Kim.

226.    F&M further breached the implied covenant of good faith and fair dealing, by applying its policies in a discriminatory manner.

227.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

228.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendant F&M as follows:

    (i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972 (erroneous outcome), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing F&M to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to

whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)     On the second cause of action for violation of Title IX of the Education Amendments of 1972 (selective enforcement), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing F&M to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's expulsion from his educational file/disciplinary records/transcript; (iv) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(iii)    On the third cause of action for violation of Title IX of the Education Amendments of 1972 (deliberate indifference), a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    On the fourth cause for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(v)     Such other and further relief as the Court deems just and proper.

### JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

Dated:   New York, New York
         March 10, 2023

                                   Respectfully submitted,

                                   **NESENOFF & MILTENBERG, LLP**
                                   *Attorneys for Plaintiff John Doe*

                                   By: */s/ Andrew T. Miltenberg*
                                       **Andrew T. Miltenberg, Esq.**
                                       *(pro hac vice admission pending)*
                                       **Stuart Bernstein, Esq.**
                                       *(pro hac vice admission pending)*
                                       **Kristen Mohr, Esq.**
                                       *(pro hac vice admission pending)*
                                       **363 Seventh Avenue, Fifth Floor**

New York, New York 10001
(212) 736-4500 (ph)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
kmohr@nmllplaw.com


SUMMERS, MCDONNELL, HUDOCK,
GUTHRIE & RAUCH, P.C,
*Attorneys for Plaintiff John Doe*

By: /s/*Kevin Rauch, Esq.*
    Kevin Rauch, Esq. Pa.ID. 83058
    Carrie McConnell, Esq. Pa. ID. 311501
    945 East Park Drive, Suite 201
    Harrisburg, Pennsylvania 17111
    717-901-5916 (ph)
    krauch@summersmcdonnell.com
    cmcconnell@summersmcdonnell.com